## Andrews v. City of Pittsburgh

*Peter J. Mansmann,* for plaintiff.
*Carl A. Eck, Daniel P. McDyer and D. R. Pellegrini,* for defendants.

LOUIK, *J.,* April 30, 1984—This matter is currently before the court upon plaintiffs' motion to remove the compulsory nonsuit which was entered by the trial court on January 25, 1983. The factual background to this matter is as follows: On July 8, 1977, plaintiffs, Melody Andrews and her husband, Steven Andrews, purchased from Ted McWilliams Porsche Audi, Inc. (hereinafter Ted McWilliams), a 1977 Porsche automobile, manufactured by the Porsche Audi Division of Volkswagen of America, Inc. (hereinafter Porsche Audi). On August 24, 1977, plaintiffs and one Kevin Quinlan, Mrs. Andrews' driving instructor, were taking a summer

night's drive in the Porsche. Mr. Andrews was dropped off at plantiffs' residence, and Mrs. Andrews and Mr. Quinlan continued their drive to the East Liberty section of the city (Mrs. Andrews only possessed a driving permit at this time, and was required to have a licensed driver with her when driving). Shortly before midnight, Mrs. Andrews and Mr. Quinlan entered Highland Park, and continued through the park onto Reservoir Road. Reservoir Road, at the time of the incident, was being prepared for resurfacing, and the blacktop had been scraped from the extreme right and left lanes; this left only the center two lanes open for travel, and covered with a certain amount of loose debris and gravel from the scraping operations (additionally, Reservoir Road had been officially closed to vehicular traffic since 11:00 p.m., or one hour before the entry by wife-plaintiff and Mr. Quinlan).

While rounding one of the sharp curves on Reservoir Road, the Porsche went into a lateral slide upon the loose gravel, and impacted with a solid curb (the speed at which the Porsche was travelling is uncertain). At this point, the rear suspension system, unable to endure the impact, collapsed, causing the Porsche to jump the curb and continue on into a tree. Mrs. Andrews was not wearing any lap or shoulder restraint and, hence, was ejected from her seat, across to the passenger's side, where her head protruded from the open passenger window and struck the tree. Mrs. Andrews sustained serious head and facial injuries from this impact.

Plaintiffs filed suit naming Porsche Audi, Ted McWilliams, and the City of Pittsburgh (hereinafter city) as defendants, alleging Restatement (Second) of Torts §402 (A) strict liability against Porsche Audi and Ted McWilliams, and negligent roadway maintenance against the city. By agreement of all

counsel, the trial was bifurcated. After two weeks of trial, plaintiffs rested their case on liability and all defendants moved for a compulsory nonsuit or, in the alternative, for the striking of testimony rendered by Richard J. Erdlac, plaintiffs' automotive design expert; additionally, city requested that the testimony of Robert Golding, plaintiffs' engineering expert, be stricken. The trial judge found that a prima facie case had not been made against any defendant and granted all three motions for nonsuit; as a result, the trial judge found it unnecessary to rule upon the competency of either Erdlac or Golding. Plaintiffs now seek to remove the entry of nonsuit as erroneous. Their grounds are primarily three-fold:

(1) that sufficient expert and lay testimony upon the presence of a "defect" was submitted to satisfy a prima facie burden under section 402 (A) strict liability, and, thus, entitled plaintiffs to a jury determination upon whether the "defect" caused Mrs. Andrews injuries;

(2) that the entry of a prima facie case in (1) against Porsche Audi, combined with Ted McWilliams' own stipulation that the suspension system was unchanged by the consumer after sale, satisfied the section 402 (A) requisites for liability on the part of a seller of defective merchandise; and

(3) finally, that the evidence established a prima facie case against the City of Pittsburgh of failure to maintain a public roadway in a manner commensurate with public safety.

With due respect to plaintiffs' reminder that a nonsuit is only justified in the clearest of cases, see Korpa v. Stuyvesant Life Ins. Co., 236 Pa. Super. 581, 351 A.2d 682 (1975), we fail to find merit to the above contentions, and now elect to uphold the entry of nonsuit by the trial court.

With regard to the initial contention, the establishment of a prima facie §402 (A) case against Porsche Audi, plaintiffs primarily rely upon the decision of Barris v. Bob's Drag Chutes and Equipment, 685 F.2d 94 (3rd Cir., 1982), which contains the following language:

"To submit a §402 (A) strict liability case to a jury, it must be shown that the product was defective, that the defect existed while the product was in the control of the manufacturer or retailer, and that the defect was the proximate cause of . . . injuries. Berkibile v. Brantly Helicopter Corp. 462 Pa. 83, 93 337 A.2d 893, 898-899 (1975). (Cite omitted.) A product is defective when it is not fit for the intended use for which it is sold. Azzarello v. Black Bros. Co., Inc. 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1978) . . . ." (Cite omitted.) Barris, supra, at 98-99.

Plaintiffs maintain that sufficient testimony (expert and lay alike) was presented at trial to support the following findings of fact: (1) that a defect was present in the rear suspension system of the Porsche, (2) that the defect was present when the automobile left Porsche Audi, and (3) that the defect disabled the suspension system from performing in accordance with one intended use of an automobile, the endurance of crash impact. Hence, plaintiffs are adamant that a jury determination of the issue of causation (i.e., whether the defect caused Mrs. Andrews' injuries) was warranted. While recognizing the authority of Barris in its recitation of the Berkebile-Azzarello standards for strict liability litigation, and the proposition that an accident is ". . . incidental to the normal and intended use of motor vehicles . . . ," see Dyson v. General Motors Corp., 298 F.Supp. 1064, 1073 (E.D., Pa. 1969), we nonetheless find plaintiffs' heavy reliance upon Barris to be misplaced. In Barris, a sprint car

racer was killed when, upon colliding with another car, his shoulder harness failed because of inferior stitching, resulting in decedent's death when the car proceeded to flip end over end. Clearly, in Barris the decedent's injuries were brought about when the defective shoulder harness did not meet with its intended use: the prevention of injury upon loss of vehicular control. This is patently distinguishable from the factual situation presented in Andrews; even if we presume a defect in the suspension system, it simply cannot be said, and was not evidenced at trial, that the purpose or "intended use" of a rear suspension system is the provision of a "buffer," or to prevent a vehicle from jumping over a solid curb when an impact occurs during an uncontrolled slide. While the Barris and Andrews accidents are conceivably alike in that the defect in question did not, per se, cause the accident, the analogy falters when the intended purpose of each piece of automotive equipment is considered.

Rather, we are in accord with defendant Porsche Audi that a routine strict-liability issue is not before us. The failure of this Porsche suspension system to endure the curb impact is more a question of whether the system was properly designed to avoid enhancement of injury upon crash impact. This category of inquiry is more properly the realm of the "enhanced injury," or crashworthiness, doctrine. Crashworthiness is an extension in legal concept and precedent upon the strict liability of section 402 (A), but involves a circumscribed sphere of liability for the manufacturer; liability is restricted to only those injuries which were enhanced, or would not have been sustained but for a defective design. The doctrine was first introduced in the Eighth Circuit decision of Larson v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968), and was later embraced by

the Third Circuit in Huddell v. Levin, 537 F.2d 726 (3rd Cir. 1976):

"We have set forth, supra, the basic elements of proof in an orthodox strict-liability case under New Jersey law: a defective product causing injury . . . Unlike orthodox products liability or negligence litigation, crashworthy or second collision cases impugning the design of an automobile require a highly refined and almost invariably difficult presentation of proof in three aspects. First, in establishing that the design in question was defective, the plaintiff must offer proof of an alternative, safer design, practicable under the circumstances . . . Second, the plaintiff must offer proof of what injuries, if any, would have resulted had the alternative, safer design been used . . . Third, as a corollary to the second aspect of proof, the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the defective design . . .

• • •

". . . Where the issue concerns a product's design, however, it would seem that expert opinion is the only available method to establish defectiveness, at least where the design is not patently defective. . . ." Huddell, supra, at 736, 737, 738.

Though Huddell involved a question of New Jersey substantive law, the guidelines to crashworthiness litigation advocated within have since been adopted by the district court for the Middle District of Pennsylvania, see Jeng v. Witters, 452 F.Supp. 1349, 1361 (M.D., Pa. 1978), and have previously been employed by selected Pennsylvania trial courts, despite the failure of any state appellate tribunal to speak to the issue, see Anderko v. Ford Motor Co., 127 P.L.J. 85 (C.P. Allegheny Co. 1974), and Householder v. General Motors Co., 33 Beaver Co. L.J. 30 (C.P., Beaver Co. 1971).

In short, then, the crashworthiness doctrine permits recovery for those injuries exacerbated by the "second collision" which results from a defective automotive design, provided expert testimony is introduced to support a finding of improper design, safer, practical alternative design, and enhancement of harm from the failure to design the automobile more safely. This, in essence, separates this category of litigation from traditional section 402 (A) precedent such as Barris, supra, MacDougall v. Ford Motor Co., 214 Pa. Super. 384, 257 A.2d 676 (1969), and Cornell Drilling Co. v. Ford Motor Co., 241 Pa. Super. 129, 359 A.2d 822 (1976), where mere lay testimony that a malfunction occurred in the absence of abnormal use and reasonable secondary causes, was sufficient to satisfy the plaintiff's prima facie burden of proof. Of necessity, we are now confronted with the matter of plaintiffs' automotive expert, Richard Erdlac: Was Erdlac competent to testify, and, if so, did his testimony enable the Andrews to make a prima facie case against Porsche Audi? After due consideration, we cannot hold that Erdlac's testimony sustained this rather cumbersome burden.

Initially, this court is of the opinion that Professor Erdlac's qualifications to testify as an automotive design expert were severely deficient. An expert witness must possess ". . . knowledge not within the ordinary reach and . . . , because of this knowledge [be] specially qualified to speak upon a particular subject . . .," Marlowe v. Lehigh Twp., 64 Pa. Commw. 587, 441 A.2d 497, 500 (1982). Furthermore, any expert that ". . . demonstrates by his own testimony that he has no experience or special knowledge of the matter at issue is incompetent as an expert . . . ," Marlowe, supra, at 500. Upon cross-examination by counsel for Porsche Audi, Professor

Erdlac, a mechanical engineer by occupation, admitted to the following shortcomings:

(1) a lack of specialized expertise in automotive engineering,

(2) little or no experience with highway design or accident reconstruction,

(3) no previous experience in the design of a suspension system for an automobile,

(4) a limited awareness of the number of factors with which an automotive engineer must concern himself when designing an automotive suspension system,

(5) no knowledge of the specific standards which the Society of Automotive Engineers has established with regard to the design of suspension systems, and

(6) as a final matter, total ignorance of the amount of force a suspension system should be able to withstand.

Such deficiencies in knowledge would appear of crucial significance in the consideration of an expert's qualifications to testify as one possessing specialized knowledge in the field of automotive design. Of his own admission, Professor Erdlac was not an automotive expert.

Secondly, were we to grant Professor Erdlac some degree of competency in the field at issue, it would appear that Professor Erdlac's calculations were made, and opinion thereby formed, in the absence of several material facts. He did not know the angle at which the rear tire impacted with the curb, nor the sideway speed at which the Porsche was travelling. He did not possess any information concerning the vehicle's moment of inertia. He could not tell, on the basis of the information with which he was supplied, where the car began to slide on the gravel. An expert cannot be expected to form a credible, well-

reasoned opinion worthy of a jury's consideration when he or she is not supplied with several pivotal factors. See Karavas v. Poulos, 381 Pa. 358, 113 A.2d 300, 304 (1955).

As a final matter, had Professor Erdlac included the aforementioned factors in his calculations, we would nonetheless find his testimony insufficient to satisfy a prima facie case against Porsche Audi. This finding derives from our previous ruling that the litigation at hand is not a routine §402(A) case, but involves an issue of crashworthiness. The doctrine of crashworthiness requires that an expert substantiate any claim of defective design with credible proof of a reasonable, safer alternative. Huddell, supra. While Professor Erdlac proposed that the suspension system be designed in a one-piece, as opposed to the current two-piece unit, he could not support his plan for alternative design with anything more concrete than a mere supposition that the system could function effectively as a single monocoque part. He had never designed the unit on paper, nor calculated the necessary thickness of metals that would be required for such a piece. Furthermore, he had no idea if a Porsche with a single unit suspension system could perform or operate in a matter commensurate with the level of performance under the current design. In short, Professor Erdlac's testimony amounted to nothing more than a mere pre-paper conjecture, which is clearly insufficient to meet the Huddell evidentiary standard.

Hence, we fail to find any merit to plaintiffs' allegation of error in the granting of a nonsuit as to defendant Porsche Audi.

Plaintiffs' second contention concerns the liability of Ted McWilliams as seller of the automobile. While it is undisputed by any party that the Porsche

and its suspension system were unchanged by the Andrews following purchase, it would be fair to say that the failure to prove a manufacturing defect against Porsche Audi robs this §402 (A) contention of any validity it otherwise possessed. The entry of nonsuit by the trial court as to defendant Ted McWilliams was undeniably proper.

As a final matter, this court is confronted with plaintiffs' third contention at trial: that the City of Pittsburgh negligently maintained Reservoir Road and, as such, is now liable for the injuries suffered by Mrs. Andrews. Plaintiffs maintain that the city was obliged to either close Reservoir Road during the resurfacing project or, in the alternative, to post a reduced speed limit in light of the dangerous condition created by the loose debris upon the roadway. It should be noted that Reservoir Road had been officially closed to vehicular traffic since 11:00 p.m., or one hour before plaintiff entered upon such road. As authority, plaintiffs cite Brader v. Lehigh Twp., 34 Pa. Super. 125 (1907), Ackey v. Bradford Twp., 32 Pa. Super. 487 (1907), and Rogers v. Shaler Twp., 164 Pa. Super. 558, 67 A.2d 806 (1949), all of which essentially stand for the proposition that a municipality is required to maintain a roadway in a manner commensurate with reasonable and ordinary care according to the circumstances (which may include notice of a defective condition, the amount of traffic a roadway services, and its adjacency to places of peril). Additionally, plaintiffs make much of the expert testimony rendered at trial by Robert Golding; a civil engineer by profession, Mr. Golding stated in essence that the gravel on Reservoir Road created an extremely hazardous peril, and necessitated a lowering of the speed limit from 25 miles per hour to 15 miles per hour to insure safe traveller navigation. While we do not quar-

rel with plaintiffs that the aforementioned legal precedent imposes a duty upon a municipality to maintain roadways in a non-negligent manner, we feel nontheless that plaintiffs have failed to satisfy a prima facie burden of negligent maintenance with the testimony of Mr. Golding.

Initially, Mr. Golding's qualifications as an expert appear inadequate. Though a competent civil engineer, Mr. Golding had no experience per se with accident reconstruction, road design or automotive engineering, all of which would be relevant to a determination of safe roadway conditions for automobile travel. Hence, Mr. Golding does not impress this court as one ". . . specially qualified to speak upon (the) particular subject . . ." at issue, Marlowe, supra, at 500.

Secondly, were we to grant Mr. Golding adequate competency to testify, several material factors appear to be missing from his calculations. For one, Mr. Golding was basing his 15 mile-per-hour safe travelling speed upon navigation in the far right lane; Mrs. Andrews, by her own testimony and the testimony of three other witnesses, was travelling in the center right lane, for which Mr. Golding had no estimation of proper speed. Furthermore, the co-efficient of friction (between roadway and tire) employed by Mr. Golding was not for gravel, but for ice; he admitted, upon cross-examination by counsel for the city, that the results of his calculations could be altered with a co-efficient for gravel upon a grooved surface. Finally, though provided by plaintiffs' counsel with an approximate speed of 20 miles per hour, Mrs. Andrews herself could not verify at what speed she was traveling on the night of the accident. An expert opinion devoid of several material factors is not worthy of a jury's consideration. See Karavas, supra, at 304.

Lastly, were we to find that Mr. Golding rendered a well-reasoned, credible opinion, taking into account all material factors, we would be constrained nonetheless to hold that evidence to support any finding of causation was absent. Mr. Golding's testimony merely supported a finding that the Porsche would not have skidded but for the unsafe road conditions created by the gravel. It was plaintiffs' additional expert witness, however, that eliminated the unsafe road conditions as a causative factor in Mrs. Andrews' injuries. Upon cross-examination by the city, Professor Erdlac was very clear that, in his opinion, the Porsche would not have jumped the curb and crashed into the tree had the suspension system been more sturdily designed; rather, he would have expected the rear wheel to "bounce back" from the curb with a proper automotive suspension design. The testimony of Mr. Golding did not in any way contradict Professor Erdlac's statements that the accident injuries were not caused by the gravel; as such, plaintiffs are fully bound to the testimony of Erdlac upon the issue of causation. See Duffy v. Nat'l. Janitorial Services, Inc., 429 Pa. 334, 336, n.2, 240 A.2d 527, 528, n.2 (1968).

Hence, we cannot find any trial court error in the entry of nonsuit as to defendant City of Pittsburgh.

For the above given reasons, plaintiffs' motion to remove the compulsory nonsuit is denied.

## ORDER OF COURT

And now, this April 30, 1984, upon consideration of the argument and briefs filed in the above entitled matter, it is ordered, adjudged and decreed that plaintiffs' motion for removal of compulsory nonsuit be and the same is hereby denied.