**Susan Durkin LAUGELLE, individually and as personal representative of the Estate of Joseph Laugelle, Jr., deceased, and as Next Friend to Anna Grace Laugelle and Margaret Grace Laugelle, Plaintiffs,**

v.

**BELL HELICOPTER TEXTRON, INC., et al., Defendants.**

**C.A. No. 10C–12–054 PRW.**

Superior Court of Delaware, New Castle County.

Submitted: Jan. 28, 2013.

Decided: Feb. 27, 2014.

As Corrected: March 19, 2014.

Gary W. Aber, Esquire, Law Offices of Gary W. Aber, Wilmington, Delaware; Bradley J. Stoll, Esquire, (pro hac vice) (argued), and Cynthia M. Devers, Esquire, (pro hac vice) The Wolk Law Firm, Philadelphia, Pennsylvania, Attorneys for Plaintiffs.

Richard Alan Barkasy, Esquire, (argued), and J. Denny Shupe, Esquire, (argued), Schnader, Harrison, Segal & Lewis LLP, Wilmington, Delaware, Attorneys for Defendants Rolls–Royce Corp. and Rolls–Royce North America, Inc.

Richard Galperin, Esquire, and David J. Soldo, Esquire, Morris James LLP, Wilmington, Delaware; V.L. Woolston, Esquire, (pro hac vice) (argued) Perkins Coie LLP, Seattle, Washington, Attorneys for Defendant Honeywell International Inc.

Joseph S. Shannon, Esquire, and Artemio C. Aranilla, II, Esquire, Marshall Dennehey Warner Coleman & Goggin, Wilmington, Delaware; J. Bruce McKissock, Esquire, (pro hac vice) (argued), Marshall Dennehey Warner Coleman & Goggin, Philadelphia, Pennsylvania, Attorneys for Defendants Air Logistics LLC and Bristow Group.

Vernon R. Proctor, Esquire, Proctor Heyman LLP, Wilmington, Delaware and Gregory W. Carboy, Esquire, (pro hac vice) (argued), Cowles & Thompson, Dallas, Texas, Attorneys for Defendant Rotorcraft Leasing, LLC.

WALLACE, J.

## I. INTRODUCTION

This wrongful death action arises out of a helicopter crash that occurred on December 11, 2008, in the Gulf of Mexico, off the coast of Sabine Pass, Texas.[1] Joseph Laugelle, Jr. ("Pilot"), the pilot of the helicopter, was transporting four passengers to an off-shore oil rig, when the helicopter crashed into the ocean about two miles offshore.[2]

In December 2010, Plaintiff Susan Durkin Laugelle, the Pilot's wife, brought suit against several manufacturers of helicopter, engine, and engine parts, as well as a company that previously owned and maintained the helicopter. Mrs. Laugelle alleges, *inter alia*, that her husband died as a result of chest injuries and asphyxia due to drowning;[3] these injuries, she claims, were the result of Defendants' negligence in the design, manufacturer, and/or maintenance of the helicopter and its components. She seeks damages for wrongful death on behalf of herself, as personal representative of the Pilot's estate, and as next friend to the Laugelles' two minor daughters (collectively "Plaintiffs").

In short, Plaintiffs allege that the accident engine lost power when a foreign substance contaminated and blocked a component of the power turbine governor ("PTG"),[4] and that the engine should have been equipped with a "manual override" for the PTG. Defendants deny liability, and argue, *inter alia*, that pilot error caused the crash, the Pilot's resultant injuries, and any other harm Plaintiffs claim. Defendant and Third–Party Plaintiff Bristow Group and Air Logistics LLC (collectively "Bristow/AL") filed a third-party complaint against the Pilot's employer, Rotorcraft Leasing Co. ("RLC"), alleging breach of contract and breach of duty to indemnify and defend.

Defendants Bell Helicopter Textron Inc. and Bell Helicopter Canada Ltd. (collectively "Bell"), Rolls–Royce Corp. and Rolls–Royce North America, Inc. (collectively "RRC"), and Honeywell International Inc. ("Honeywell") have each moved for summary judgment. In addition, RRC moved for partial summary judgment on the warranty and punitive damages claims. Bristow/AL and RLC have both moved for summary judgment on the third-party complaint. This is the Court's decision on those six motions.[5]

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Plaintiffs and the Accident

At the time of his death, the Pilot was a resident of Massachusetts, where he lived with his wife and his two daughters. As a RLC employee, the Pilot shuttled passengers between the United States mainland and offshore oil rigs throughout the Gulf of

---

1. *See* Complaint, ¶ 1.

2. *See id.* at ¶¶ 52, 53.

3. *See id.* at ¶ 53.

4. The power turbine governor is an element of the helicopter's fuel delivery and control system.

5. The Court has stayed multiple motions *in limine* pending decision on these dispositive motions. *Laugelle v. Bell Helicopter Textron Inc.*, Del.Super.Ct., C.A. N10C–12–054, Wallace, J. (Oct. 18, 2013) (ORDER).

Mexico. On December 11, 2008, the Pilot operated a Bell 206L–4 helicopter, identified as N180AL [6] (the "accident helicopter"), which contained an Allison model 250–C30P turbine engine [7] (the "accident engine") that was equipped with a PTG manufactured by Honeywell.[8] The accident helicopter, with the Pilot and four passengers aboard, crashed into the Gulf of Mexico approximately 2 miles off-shore. There were no survivors.

## B. The Dispute Between Bristow/AL and RLC

In 2008, Bristow/AL sold assets including helicopters (the "Purchased Aircraft"), spare parts and components, and flight contracts to Rotorcraft Leasing Co. (again "RLC"). An Asset Purchase Agreement (the "PA") governing the transaction was dated August 5, 2008, but did not close until October 30, 2008.[9] As part of the asset transfer, Bristow/AL transferred the accident helicopter, a Bell 206L identified

as N180AL, to RLC on November 15, 2008.

In addition to the PA, Bristow/AL and RLC entered into a Transition Service Agreement ("TSA"), dated October 30, 2008, which governed the relationship between the two parties during the period of time required for RLC to obtain FAA approval to operate the Purchased Aircraft under its Part 135 Certificate.[10] Under the TSA, Bristow/AL continued to operate some of the Purchased Aircraft as an employee of RLC.[11] In addition, the TSA contemplated risk allocation and included indemnity clauses: [12]

> The Parties intend and agree that ... [RLC] shall release, indemnify, hold harmless and defend (including payment of reasonable attorneys fees and costs of litigation) [Bristow/AL] from and against any and all claims, demands, causes of action, damages, judgments and awards of any kind or character, without limit and without regard to the cause or causes thereof, strict liability,

---

6. The helicopter's serial number was 52104. Complaint at ¶ 53.

7. The engine's serial number was CAE895743.

8. As explained below, the Honeywell PTG had been "overhauled," a legally valid procedure, by another company after its permissible life expectancy had lapsed.

9. *See Laugelle v. Bell Helicopter Textron Inc.,* C.A. N10–12–054, at 43, 60 (Del.Super.Ct. Oct. 16, 2013) (TRANSCRIPT).

10. *See* Ex. B to Bristow/AL's Mot. for Summary Judgment, Mar. 22, 2013, at ¶ B. A Part 135 Certificate holder "means a person holding an operating certificate issued under part 119 of title 14, Code of Federal Regulations, that is authorized to conduct civil helicopter air ambulance operations under part 135." 49 U.S.C. § 44730 (2012); *see Hasler Aviation, L.L.C. v. Aircenter, Inc.,* 2007 WL 2263171, at *2 (E.D.Tenn. Aug. 3, 2007) ("Be-

fore any aircraft may be placed into service, its owner must obtain from the FAA an airworthiness certificate, which denotes that the particular aircraft in question conforms to the type certificate and is in condition for safe operation.") (quoting *United States v. Varig Airlines,* 467 U.S. 797, 804, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)).

11. *See* Ex. B to Bristow/AL's Mot. for Summary Judgment, March 22, 2013, at ¶ C ("Until such time as all of the Purchased Aircraft are approved by the FAA for operation by [RLC], ... [RLC] shall employ [Bristow/AL] to run the Aircraft Business....."); *id.* at Sec. 1.01 ("[RLC] hereby appoints [Bristow/AL] to conduct the Aircraft Business, to act as the operator for the Aircraft Business, and to have Operational Control over the Aircraft Business from and after the Closing Date until the termination date hereof.... As used herein 'Aircraft Business' shall mean the conduct of flight and maintenance operations as a Part 135 Air Carrier....").

12. *See id.* at Section 5.02.

tort, breach of contract, or the negligence of any person or persons, including that of [Bristow/AL], whether such negligence be ... any ... theory of legal liability.[13]

The TSA also required RLC to add Bristow/AL as an additional insured on its policies, though RLC never did.[14]

### C. The Accident Engine and Accident Helicopter [15]

The accident helicopter contained an Allison 250–C30P, a turbine engine manufactured by General Motors Corporation's Allison Gas Turbine Division ("GM") in 1993. GM shipped the accident engine to Bell, a helicopter manufacturer, on October 22, 1993.[16] Bell incorporated the accident engine into the accident helicopter, a Bell model 206L–4, and soon after, on December 15, 1993, Bell sold the accident helicopter to Offshore Logistics Inc. ("Offshore Logistics"), a predecessor-in-interest to Bristow/AL. Following sale of the accident helicopter to Offshore Logistics, Bell sent GM a Commercial Aircraft Delivery Report on January 4, 1994.[17]

On December 1, 1993, GM had sold the assets of its Allison Turbine Division to AEC Acquisition Corp. ("AEC"), which later changed its name to Allison Engine Company, Inc. ("Allison"), in an all-cash transaction. The parties do not dispute that the Asset Purchase Agreement ("APA") governing the sale expressly provided that GM would retain all liabilities, obligations, and commitments with respect to personal injury, wrongful death, or property claims arising out of an accident allegedly caused by an engine "sold or leased" by GM before December 1, 1993, and that Allison would have no liability for such claims.[18] Plaintiffs and RRC do dispute whether GM's shipping of the accident engine to Bell, which occurred before December 1, 1993, or Bell's sale of the completed helicopter to the Offshore Logistics, which occurred after December 1, 1993, constitutes the sale or lease as referenced in the APA.

On March 24, 1995, over a year after GM's sale of its Allison Turbine Division assets, Rolls–Royce plc [19] purchased all of Allison's assets in an arms-length transaction and began manufacturing the Allison 250–C30P model engine. About five years later, Allison changed its name to RRC. For purposes of this opinion, the Court will refer to Allison as RRC from the point of its acquisition by Rolls–Royce plc. RRC is the type certificate holder [20] for the Allison 250–C30P model turbine engine.

---

13. *See id.* at Section 5.03(a).

14. *See Laugelle v. Bell Helicopter Textron Inc.,* C.A. n10–12–054, at 37 (Del.Super.Ct. Oct. 16, 2013) (TRANSCRIPT).

15. These facts, the most salient of which are uncontested, are taken primarily from RRC's Mot. for Summary Judgment, Sept. 6, 2013.

16. *See* Ex. D to Aff. of Thomas Gregory Sain.

17. *See* Ex. E to Aff. of Thomas Gregory Sain.

18. *See* Ex. H to Aff. of Thomas Gregory Sain, at §§ 1.62, 2.2.·

19. Rolls–Royce plc is a public holding company based in the United Kingdom.

20. *See Hasler Aviation, L.L.C. v. Aircenter, Inc.,* 2007 WL 2263171, at *2 (E.D.Tenn. Aug. 3, 2007) ("In the Federal Aviation Act of 1958 ... Congress established a multistep certification process for aircraft. The FAA developed a comprehensive set of regulations which establish minimum safety standards the designers and manufacturers of aircraft must meet.... After a manufacturer demonstrates its aircraft meet applicable safety standards, the FAA issues a type certificate, which permits a manufacturer to continue into production and marketing.") (internal citations omitted).

### D. The Power Turbine Governor [21]

The accident engine contained a PTG that was first manufactured in May 2003 by a predecessor-in-interest to Honeywell.[22] An aviation parts distributer first sold the PTG to Bristow/AL in January 2005. And it was then first installed on a helicopter not involved in the current litigation by Bristow/AL.

Such a PTG has a 2,000–hour service life. So after approximately 37 months, on March 9, 2008, Bristow/AL removed the PTG from service. Then, as is permissible, Bristow/AL completed an overhaul of the entire unit. And in May 2008, Bristow/AL certified and installed the "re-manufactured" unit on the accident engine. The unit then accumulated 528 service hours before the accident helicopter crashed on December 11, 2008.

### III. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Superior Court Civil Rules, summary judgment is appropriate if, viewing the facts in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [23] The standard for a motion for summary judgment is by "clear and convincing evidence," which is "an intermediate evidentiary standard, higher than mere preponderance, but lower than proof beyond a reasonable doubt." [24] Clear and convincing evidence requires the proof to be "highly probable, reasonably certain, and free from serious doubt." [25]

Upon receipt of a motion for summary judgment, the Court may consider any submissions described in Rule 56(c), unless good reason has been given to do otherwise.[26] The Court may never, however, rely on evidence that would not be admissible at trial.[27] The Court may consider an expert's or non-expert's affidavit, but only if the affidavit is supported by a factual foundation and amounts to more than mere speculation or conjecture.[28] If

21. *See generally Laugelle v. Bell Helicopter Textron Inc.*, C.A. N10–12–054, at 167–70 (Del.Super.Ct. Oct. 16, 2013) (TRANSCRIPT).

22. Ex. G to Aff. of Thomas Gregory Sain.

23. Super. Ct. Civ. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del.1979).

24. *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del.2002) (citing *In re Tavel*, 661 A.2d 1061, 1070 n. 5 (Del.1995)) ("If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate. If a rational trier of fact could find any material fact that would favor the non-moving party in a determinative way (i.e., that the clear and convincing standard could be met at trial), summary judgment is inappropriate.").

25. *Id.*

26. *See, e.g., Phillips v. Delaware Power & Light Co.*, 216 A.2d 281, 284 (Del.1966) ("Any consideration by a Court of a motion for summary judgment is limited to the types of matters included within Superior Court Rule 56 ... unless good reason has been given why affidavits cannot be presented.").

27. *See, e.g., Lundeen v. Pricewaterhousecoopers LLC*, 2006 WL 2559855, at *8 (Del.Super.Ct. Aug. 31, 2006) ("However, neither affidavit constitutes admissible evidence as neither person had personal knowledge of the latter nor were they offered as expert witnesses. As this Court can only consider admissible evidence in deciding a motion for summary judgment, neither of those affidavits will be considered here.").

28. *Lynch v. Athey Products Corp.*, 505 A.2d 42, 45 (Del.Super.Ct.1985) (refusing to consider an expert's affidavit on a motion for summary judgment because the affidavit contained "only conclusory allegations which, without a factual foundation, do not amount to more than speculation and conjecture and cannot

the affidavit contains both admissible and inadmissible material, the Court may consider only the admissible, while striking the remainder.[29]

With respect to contract disputes, summary judgment is appropriate where the issue is clear and unambiguous.[30] Where reasonable minds differ as to a contract's meaning, a factual dispute results, and summary judgment is improper.[31] Finally, the Court should not grant summary judgment where, "upon an examination of all the facts, it seems desirable to inquire thoroughly into them in order to clarify the application of the law to the circumstances."[32]

■ Where the parties have filed cross-motions for summary judgment and have not argued that there are genuine issues of material fact, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.[33] Neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law.[34]

## IV. DELAWARE'S WORKERS' COMPENSATION STATUTE BARS BRISTOW/AL'S CLAIM

■ Bristow/AL moves for summary judgment on its third-party complaint, filed in this Court on July 20, 2012. Bristow/AL argues, *inter alia*, that RLC "has failed to honor its contractual obligations"[35] in conjunction with the TSA, and Bristow/AL is "entitled to full defense and indemnity from [RLC] for the claims asserted by plaintiffs."[36] RLC filed a cross-motion for summary judgment, alleging several defenses, including Delaware's workers' compensation statute.[37]

In its motion, RLC principally relies on the Delaware Supreme Court's decision in *Precision Air, Inc. v. Standard Chlorine of Delaware, Inc.*[38] There our supreme court affirmed this Court's denial of Precision Air's motion to dismiss a third-party complaint brought by Standard Chlorine of Delaware ("Standard"); a Precision Air employee had brought a personal injury action against Standard for injuries he suffered while performing services that Stan-

---

be tested or countered by the opposing party"); *see Harris v. Penserga*, 1990 WL 9505, at *2 (Del.Super.Ct. Jan. 10, 1990) (striking an affidavit where the "expert's" opinions did not have adequate factual support). *C.f., Stoltz Realty Co. v. Paul*, 1995 WL 654142, at *1 (Del.Super.Ct. Oct. 13, 1995) (finding affidavits based on personal knowledge sufficient and denying a motion to reargue a motion for summary judgment).

29. *Lynch*, 505 A.2d at 46.

30. *GMG Capital Invs., LLC v. Athenian Venture Partners I, LP*, 36 A.3d 776, 783 (Del. 2012).

31. *Id.*

32. *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del.1962).

33. *E.I. du Pont de Nemours & Co. v. Medtronic Vascular, Inc.*, 2013 WL 261415, at *10 (Del.Super.Ct. Jan. 18, 2013).

34. *Id.; see* Del.Super. Ct. Civ. R. 56(h).

35. Bristow/AL's Third–Party Complaint at ¶ 16.

36. *Id.* at ¶ 17.

37. *See* DEL.CODE ANN. tit. 19, § 2304 ("Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies.").

38. 654 A.2d 403 (Del.1995).

dard had hired Precision Air to complete.[39] Standard had contracted Precision Air to "stack-test" boilers at Standard's chemical production plant.[40] The parties entered into a contract which provided: (1) that Precision would "employ a competent foreman and any necessary employees ... so that the Work [sic] shall be done in a safe, good, substantial and workmanlike manner,"[41] and that (2) Precision would indemnify Standard against "any and all claims, causes of action, liability, damage, costs, and expenses."[42] In its motion to dismiss Standard's third-party complaint, Precision Air argued § 2304 of Title 19 "prohibited direct or indirect suits against it for its negligence and that the Indemnification Clause thus was not valid."[43]

The Supreme Court agreed that § 2304 barred Standard from recovering from Precision Air based on a contribution theory,[44] but did not bar Standard's recovery under a theory of indemnification. In doing so, the Supreme Court reiterated Delaware's narrow exception to § 2304's exclusive remedy bar to recovery:

> An employer, even though it has paid workmen's compensation benefits to an injured employee, can be held contractually liable to a third party where a contract between the employer and third party contains provisions *requiring the employer* to: (i) perform work in a workmanlike manner; **and** (ii) indemnify the third-party-indemnitee for any claims arising from the employer-indemnitor's own negligence.[45]

Here, RLC argues, and the Court agrees, that Bristow/AL has not shown that narrow exception applies.

In the context of the TSA, Bristow/AL agreed to conduct "Aircraft Business"[46] on behalf of RLC for the duration of the agreement. Thus, in contrast to *Precision*

39. *Id.* at 405.

40. *Id.*

41. *Id.*

42. *Id.*

43. *Id.* at 406; *see* DEL.CODE ANN. tit. 19, § 2304.

44. *Id.* at 406–07 ("Section 2304 precludes the imposition of joint tort liability upon an employer in a suit brought by an injured employee against a third party where the employer has paid compensation benefits to the employee.... Because the employer cannot be held liable as a joint tortfeasor, it is not obligated to provide contribution to the third party.... The particular legal theory that the third party employs in attempting to recover from the employer does not affect this result."); *Howard, Needles, Tammen & Bergendoff v. Steers, Perini & Pomeroy*, 312 A.2d 621, 623 (Del.1973) ("[I]t is clear that, because Contractor has paid compensation to the original plaintiffs under the Workmen's Compensation Law, Contractor is not liable to Engineers as a joint tort-feasor."); *Diamond State Tel. Co. v. University of Delaware*, 269 A.2d 52, 55–56 (Del.1970) ("Diamond may not be held jointly liable with the University ... [t]he reason for this is that Diamond has paid compensation under the Workmen's Compensation Law.... [T]he payment of compensation to an injured employee or his representatives is exclusive and precludes the assertion of any other remedies against the employer.").

45. *Precision Air*, 654 A.2d at 407 (certain emphasis added); *see id.* (making it clear that Delaware law recognizes that a third-party tortfeasor may assert a claim against the injured party's employer for *that employer's* breach of an express or implied contract with the third party to perform in a careful and prudent manner, where *the employer's* breach of that contractual duty was the actual cause of the employee's injury); *see also id.* at 408 ("These two provisions create an 'independent duty' based on the contract law principle of indemnification.").

46. *See* Ex. B to Bristow/AL's Mot. for Summary Judgment, Mar. 22, 2013, at Sec. 1.01 ("'*Aircraft Business*' shall mean the conduct

*Air* and *Diamond State*,[47] the third-party indemnitee provided services to the employer.[48] Bristow provided maintenance, fueling, and other services during the transition period governed by the TSA. Bristow/AL's cited cases involved "injury to an employee whose employer had contracted with another party to perform services"[49] for that other party, then allegedly did so negligently, thereby causing injury to its employee who in turn pursued an action against that other party.[50] Because RLC, as the employer, did not contract to provide any services to Bristow/AL, the first condition triggering the exception is missing here, and Bristow/AL's claim is barred.

Summary judgment is also in keeping with the general policy of Delaware's Workers' Compensation statute. The Supreme Court's narrow exception to the exclusivity principle protects third-party indemnitees from the negligent actions of employer/contractors that cause harm to the employer/contractor's employees. The theory of liability rests in the employer/contractor's obligations (1) to perform in a workmanlike manner and (2) to indemnify the third-party indemnitee. Together, "[such] two provisions create an 'independent duty' based on the contract law principle of indemnification."[51] Without such an exception, a third-party indemnitee would have no mode of recourse against a negligent employer/contractor who creates an unsafe working environment for its own employees.

Here the employer, RLC, did not provide services. Rather, RLC contracted for Bristow/AL to provide services. Thus there was no promise, express or implied, by RLC to provide services in a workmanlike manner, a condition precedent to invoking the narrow exception.[52] While Delaware's exclusive remedy bar does not invalidate the indemnification clause in its entirety, it bars Bristow/AL from recovering under that clause for claims originally brought by an RLC employee to whom RLC has paid workers' compensation. Consequently, RLC is entitled to judgment as a matter of law; its motion for summary judgment is **GRANTED**,[53] and Bristow/AL's cross-motion for summary judgment is **DENIED**.

## V.   RRC's MOTION FOR SUMMARY JUDGMENT

### A.   New York law applies to the APA.

The APA executed between GM and AEC contains a forum selection clause designating New York law as governing. And the Parties agree that there is no conflict of law between New York and Delaware law on the issues relevant to this aspect of the litigation.[54] The Court therefore analyzes the APA governing the sale of GM's Allison Gas Turbine Division to AEC under New York law.

of flight and maintenance operations as Part 135 Air Carrier....").

47.   269 A.2d 52 (Del.1970).

48.   *See id.* at 58 ("[I]t is obvious that whether or not there exists liability to indemnify a third party depends entirely upon the factual circumstances surrounding the incident.").

49.   *See Menkes v. Saint Joseph Church,* 2011 WL 1235225, at *5 (Del.Super.Ct. Mar. 18, 2011).

50.   *Id.*

51.   *Precision Air,* 654 A.2d at 408.

52.   *SW (Delaware), Inc. v. American Consumers Industries, Inc.,* 450 A.2d 887, 888 (Del. 1982).

53.   RLC has moved for an award of attorneys' fees and costs. An Order addressing RLC's request has been filed contemporaneously with this Opinion.

54.   *See* Ex. H to Aff. of Thomas Gregory Sain, at § 13.8; RRC's Mot. for Summary Judgment, Sept. 6, 2013, at 7.

## B. RRC bears no successor liability under the APA because the accident engine was sold prior to December 1, 1993.

█ Plaintiffs and RRC dispute whether the accident engine was "sold or leased" prior to the December 1, 1993 liability cutoff date. RRC contends the sale occurred on or about October 22, 1993, when RRC delivered the accident engine to Bell. If RRC is correct, GM is the proper party to answer for Plaintiffs' wrongful death claims. In support of its summary judgment motion, RRC provided a copy of the Packing Room Check Sheet that evidences the accident engine's October 22, 1993 ship date from GM.[55]

Plaintiffs claim, however, that looking at the facts presented in the light most favorable to them, RRC has failed to demonstrate that there are no genuine issues of material fact. Specifically, Plaintiffs argue the Packing Room Check Sheet cannot, by itself, support a reasonable inference that the accident engine was sold on October 22, 1993. Instead, Plaintiffs contend that December 15, 1993, the date Bell (the engine's purchaser) delivered the accident helicopter to Offshore Logistics,[56] is the temporal point of sale under the APA. Absent a contract for sale, Plaintiffs argue, there is a question of fact as to whether the engine was considered "sold" on October 22nd or on December 15th.

Under New York's Uniform Commercial Code ("NY UCC"), "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." [57] The N.Y. UCC further provides that unless otherwise agreed upon by the parties, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . ." [58]

The Parties did not present the Court with a contract for sale,[59] but from the Packing Room Check Sheet, the Court can reasonably infer that GM and Bell's agreement contemplated GM's delivery of complete engines to Bell.[60] Under the N.Y. UCC, if a contract requires delivery, title passes upon tender at the delivery destination.[61] Acknowledging § 2–401(2)(b) applies in this context, the Court is left to decide whether under these specific facts proof of shipment on October 22, 1993 is enough to support a reasonable inference that the accident engine arrived at Bell Canada prior to December 1, 1993. The Court finds it is.

Only sixty days [62] after the accident engine left the Allison Gas Turbine Division

---

55. Ex. D. to Aff. of Thomas Gregory Sain.

56. *See* Ex. E to Aff. of Thomas Gregory Sain.

57. N.Y. Uniform Commercial Code § 2–106(1) (McKinney 2013).

58. N.Y. Uniform Commercial Code § 2–401(2) (McKinney 2013).

59. Although Plaintiffs sought the contract during discovery, during oral argument, RRC's Counsel represented to the Court that the 1993 contract had not been retained in the normal course of business and was unavailable for production.

60. *See* Ex. F to Aff. of Thomas Gregory Sain (showing the Allison Gas Turbine Division

was located in Indianapolis, Indiana); Ex. D to Aff. of Thomas Gregory Sain (showing the Allison Gas Turbine Division shipped the accident engine to Bell–Canada); Ex. E to Aff. of Thomas Gregory Sain (showing Bell Helicopter Textron Canada was located in Mirabel, Quebec, Canada).

61. N.Y. Uniform Commercial Code § 2–401(2)(b) (McKinney 2013).

62. Although the Parties represent that the Bell helicopter was delivered to Bristow/AL on December 15, 1993, the record is not clear as to whether the helicopter was delivered on December 15, 1993 or December 20, 1993. *Compare* Ex. E to Aff. of Thomas Gregory Sain, *with* Ex. F to Aff. of Thomas Gregory

on October 22, 1993, the fully assembled accident helicopter containing the accident engine was delivered to Offshore Logistics in Lafayette, Louisiana.[63] The Court finds it is "highly probable, reasonably certain, and free from serious doubt,"[64] that the accident engine arrived at the Bell Canada facility in Quebec prior to December 1, 1993. To infer otherwise would be to assume the accident engine spent a minimum of forty-one days in transit before delivery to Bell Canada. And then, in less than half that transit time: (1) the accident engine was installed into the accident helicopter; (2) the accident helicopter was fully assembled; (3) the fully-assembled helicopter was shipped by Bell Canada; and (4) that assembled helicopter was received in Louisiana by Offshore Logistics. Thus, while there is a question of fact as to when precisely the accident engine arrived at the Bell Canada facility, the Court is permitted to reasonably infer from the evidence that the accident engine arrived prior to December 1, 1993. For that reason, RRC is sheltered from Plaintiffs' product liability negligence claim.[65]

### C. The Federal Aviation Act cannot serve as a basis for RRC's individual tort liability.

Plaintiffs also allege that RRC is individually liable for its alleged failure to manufacture and require end users to install a PTG lockout fix. In support Plaintiffs argue that 14 C.F.R. § 21.3, which defines the responsibilities of a type-certificate holder, creates a duty to warn of potential product dangers.[66] Thus Plaintiffs argue RRC, as type-certificate holder for the Allison 250–C30P model turbine engine, had a duty to warn of known dangers. Further, Plaintiffs present a collection of service difficulty reports ("SDRs") as evidence that RRC knew or should have known the accident engine was susceptible to a single-point failure that had the potential to cause injury or death.[67] In addition to arguing that the Code of Federal Regulations does not create a duty to warn, RRC argues that any duty under 14 C.F.R. § 21.3 is limited to reporting "any failure, malfunction, or defect in any product or article *manufactured by it.*"[68] Since RRC did not manufacture the accident helicopter, its argument goes, it had no duty under the Code. RRC[69] further contends that the SDRs selected by Plaintiffs to show knowledge of the danger of a single-point failure in the Allison 250–C30P model are neither relevant nor reliable, contain hearsay within hearsay, would be confusing to the jury, and would be unfairly prejudicial to Defendants.[70]

---

Sain. For the purposes of this motion, taking the facts in the light most favorable to Plaintiffs, the Court adopts the December 20, 1993 delivery date.

63. *See* Ex. D to Aff. of Thomas Gregory Sain.

64. *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1151 (Del.2002) (quoting Del. P.J.I. Civ. Sec. 4.3 (2000)).

65. *See generally* Complaint at Count V.

66. *See* 14 C.F.R. § 21.3(a) ("The holder of a type certificate (including amended or supplemental type certificates) ... must report any failure, malfunction, or defect in any product or article manufactured by it that it deter-

mines has resulted in any of the occurrences listed in paragraph (c) of this section."); *id.* at § 21.3(c)(10) (requiring a type-certificate holder to report any failure, malfunction, or defect resulting in "[a]n engine failure").

67. That collection of SDRs is the subject of a Motion in Limine filed by Defendants. An Order on that motion has been filed contemporaneously with this Opinion.

68. 14 C.F.R. § 21.3(a) (emphasis added).

69. Along with the other remaining Defendants in this case.

■ Because 14 C.F.R. § 21.3 requires type-certificate holders to report *known* failures, defects, and malfunctions, under the specific facts presented here, the Court must first determine whether the SDRs are admissible to show that RRC, as Plaintiffs argue, knew of a defect that caused engine failure. If the SDRs are inadmissible, Plaintiffs' claim fails. In total, Plaintiffs offer less than 30 SDRs, which themselves are short "reports" of service issues written by unnamed pilots or technicians.[71] Not one SDR author can be verified. And, as to many, critical entry fields are left blank, leaving little context for a finder of fact to interpret the reports. The Delaware rules of evidence generally prohibit the introduction of hearsay evidence and wholly prohibit evidence the probative value of which is substantially outweighed by its danger of unfair prejudice or its potential to mislead the jury.[72] Allowing the SDRs would inject both in these proceedings.

The Court understands Plaintiffs to argue that the SDRs are non-hearsay offered only as evidence of notice, and not for the truth of the matter asserted in the documents. Yet Plaintiffs belie that notion by simultaneously arguing the SDRs are factual reports of PTG failures. No doubt Plaintiffs wish to argue the SDRs are specific evidence of PTG failure demonstrat-

ing notice to certain Defendants as support for this claim and accompanying punitive damages claims.[73] In other words, Plaintiffs want admission of the reports as non-hearsay for the purpose of arguing the purported truth they read into the SDRs—known PTG failures—to the jury. Neither the Plaintiffs nor the Court can logically disentangle these purposes under the facts presented here. And so exclusion of such evidence is appropriate.[74] The danger of unfair prejudice to Defendants and misdirection of the jury is such that the Court must exercise its discretion [75] to preclude admission of the proffered Plaintiffs' SDRs.

■ Moreover, even assuming the SDRs were admissible evidence, they cannot reasonably support the inference Plaintiffs wish to make: that the SDRs demonstrate RRC's negligence in failing to warn consumers of a *known defect* which could cause engine failure. Assuming without deciding that 14 C.F.R. § 21.3 requires non-manufacturer type-certificate holders to report failures, malfunctions, and defects, and that the regulation creates a duty to warn grounded in tort, the SDRs are too non-specific to establish a known defect existed and that RRC negligently failed to warn consumers of said defect.[76] RRC's Motion for Summary Judgment is therefore **GRANTED**.

**70.** *See* Defts' Mot. in Limine to Exclude Reports of Unrelated Incidents Involving PTGs, Including SDRs, Oct. 2, 2013.

**71.** *See id.* at Ex. 1.

**72.** D.R.E. 802; D.R.E. 403.

**73.** *See* D.R.E. 801(c) (Hearsay is a statement "offered in evidence to prove the truth of the matter asserted.").

**74.** *See generally, Sanabria v. State*, 974 A.2d 107 (Del.2009) (discussing the difficulties and dangers of admitting anonymous statements

not for the truth of their content, particularly when that content directly relates to an element of the offering party's claim).

**75.** *Laws v. Webb*, 658 A.2d 1000, 1010 (Del. 1995) ("It is [ ] within the discretion of the trial court to determine whether the probative value of certain evidence is substantially outweighed by the danger of unfair prejudice to the opposing party.").

**76.** The Southern District of Texas, without deciding whether 14 C.F.R. § 21.3 may serve as the basis for a negligence claim, refused to extend the FAA Regulation to a

## VI. RRC's Motion for Partial Summary Judgment on Plaintiffs' Warranty Claim and Claim for Punitive Damages

As RRC's motion for summary judgment is granted, its companion motion addressing Plaintiffs' warranty and punitive damages claims is **MOOT.**

## VII. Bell's Motion for Summary Judgment [77]

### A. Delaware law applies to Plaintiffs' negligence claims.

As an initial matter, neither Plaintiffs nor Bell dispute that Delaware law applies to Plaintiffs' negligence claims.[78]

### B. Plaintiffs cannot recover under a strict liability theory.

■ Delaware does not recognize strict products liability actions for the sale of goods.[79] In Delaware the "remedies for a sale of products in products liability cases are confined to sales warranty law, with no remedy outside the UCC." [80] Accordingly Bell's motion is **GRANTED** with respect to strict liability.

---

non-manufacturer type-certificate holder. *Dalrymple v. Fairchild Aircraft, Inc.*, 575 F.Supp.2d 790, 796–97 (S.D.Tx.2008) ("By its plain terms, § 21.3 applies only to a type certificate holder that *also* manufactured the subject product or part that is determined to be defective.... The reporting requirement in § 21.3(a) does not apply to a non-manufacturer such as Defendant.") (emphasis in original); *see Hasler Aviation, L.L.C. v. Aircenter, Inc.*, 2007 WL 2263171, at *5 (E.D.Tenn. Aug. 3, 2007) ("FAA regulations impose a duty to report defects in any product, part, process, or article manufactured by the type certificate holder") (internal quotation marks omitted); *see also Whaley v. Perkins*, 197 S.W.3d 665, 673 (Tenn.2006) ("[Negligence per se] is not a magic transformational formula that automatically creates a private negligence cause of action for the violation of every statute.") (internal quotation marks omitted). The *Dalrymple* court determined that accident aircraft's type-certificate holder, which had acquired the type-certificate to the accident aircraft model through a merger with the original manufacturer and type-certificate holder, bore no duty to report failures, malfunctions, or defects under 14 C.F.R. § 21.3 because it had not manufactured the accident aircraft. *Dalrymple*, 575 F.Supp.2d at 797. A California court of appeals found differently; "a successor manufacturer steps into the shoes of a' predecessor with regard to the duties of reporting defects," as required by 14 C.F.R. § 21.3. *Burroughs v. Precision Airmotive Corp.*, 78 Cal.App.4th 681, 693, 93 Cal. Rptr.2d 124 (Cal.App.4th 2000) (finding reporting requirements applied to a non-manufacturer type-certificate holder, "even though

technically the particular model of carburetor in question ... was not 'manufactured by it.'") (interpreting the General Aviation Revitalization Act's ("GARA") statute of repose); *see also Hetzer–Young v. Precision Airmotive Corp.*, 184 Ohio App.3d 516, 921 N.E.2d 683, 698 (8th 2009) (finding "any knowing misrepresentation, concealment, or withholding of information regarding the cause of the ... defect involves information required to be disclosed to the FAA," even though the type-certificate holder did not manufacture the "float" at issue).

77. Plaintiffs informed the Court that they are no longer pursuing their claims that the helicopter: (1) failed to remain afloat; (2) lacked adequate emergency exists; (3) had a defective freewheeling unit; and (4) contained a design flaw that failed to prevent ice from forming in the fuel system. *Laugelle v. Bell Helicopter Textron Inc.*, C.A. N10–12–54, at 116–17 (Del.Super.Ct. Oct. 16, 2013) (TRANSCRIPT).

78. During oral argument on October 16, 2013, Plaintiffs' counsel and Bell's counsel both represented to the Court that, if the Court were not inclined to apply separate state law to Plaintiffs' several negligence claims, the Court should apply Delaware law to all Plaintiffs' negligence claims. Because there has been no application otherwise, and in the interests of judicial economy, the Court will apply Delaware law to each of Plaintiffs' negligence claims. *Id.* at 106, 122, 137.

79. *Cline v. Prowler Indust. of Maryland, Inc.*, 418 A.2d 968, 980 (Del.1980) ("Accordingly, we conclude that it is not within the power of

## C. Only the Pilot's estate may recover under a negligent infliction of emotional distress claim.

Plaintiffs conceded at oral argument that only the Pilot, or the personal representative of his estate, may recover under Delaware law for negligent infliction of emotional distress.[81] Thus summary judgment on Count X of Plaintiffs' Complaint is **GRANTED in PART**; Mrs. Laugelle, Anna Grace Laugelle, and Margaret Grace Laugelle may not recover for negligent infliction of emotional distress.

## D. Bell's Motion for Summary Judgment on Plaintiffs' mental distress claims is resolved by the Court's October 1, 2013 Opinion granting Defendants' Motion to Determine Applicable Law.

The Court has already determined that Massachusetts law applies to Plaintiffs' claims for compensatory damages.[82] Compensatory damages for mental distress are not recoverable under Massachusetts law.[83] So Plaintiffs cannot recover mental distress damages.

## E. Plaintiffs cannot recover punitive damages.

Delaware's [84] high bar for a plaintiff to recover punitive damages requires demonstration of a defendant's "outrageous conduct," "an evil motive," or "reckless indifference."[85] Where a plaintiff does not allege a defendant acted intentionally or with malice, a defendant's actions are "tested under the standard of recklessness, i.e., a conscious indifference to the rights of others."[86] "Where the

---

this Court to adopt the doctrine of strict tort liability in sales cases due to the preeminence of the Uniform Commercial Code in the sales field of the law."); *White v. APP Pharm., LLC,* 2011 WL 2176151, at *2 (Del.Super.Ct. Apr. 7, 2011) ("The Uniform Commercial Code preempts the field of sales and does not allow for the doctrine of strict liability when the product is sold.").

80. *White,* 2011 WL 2176151, at *2.

81. *See Fanean v. Rite Aid Corp. of Delaware, Inc.,* 984 A.2d 812, 820 (Del.Super.Ct.2009) (allowing recovery against a tortfeasor by a plaintiff who was within the "immediate area of physical danger from that negligence"). In order to recover for negligent infliction of emotional distress, a plaintiff must show: (1) that the defendant negligently caused fright to him or her; (2) that he or she was in the "zone of danger" at the time of the negligent act; and (3) that the negligently inflicted fright or shock caused physical consequences. *Rhinehardt v. Bright,* 2006 WL 2220972, at *5 (Del.Super.Ct. July 20, 2006); *see also* Restatement (Second) Torts § 313.

82. *See Laugelle v. Bell Helicopter Textron, Inc.,* 2013 WL 5460164, at *4 (Del.Super.Ct. Oct. 1, 2013).

83. Mass. Gen. Laws Ann. ch. 229, § 3724(d)(5); *see MacCuish v. Volkswagenwerk A.G.,* 22 Mass.App.Ct. 380, 494 N.E.2d 390, 401 (1986).

84. While Defendants moved the Court to apply Massachusetts law to Plaintiffs compensatory damages, no party has made any such application with respect to punitive damages. The purpose of punitive damages is to deter reckless conduct. *Roberts v. Delmarva Power & Light Co.,* 2 A.3d 131, 145 (Del.Super.Ct.2009). Texas law might be deemed to apply since Bell, a Texas corporation, allegedly committed reckless conduct. But with no motion to do otherwise, the Court will apply the Delaware standard.

85. *Jardel Co., Inc. v. Hughes,* 523 A.2d 518, 529 (Del.1987). "Mere inadvertence, mistake or errors of judgment which constitute mere negligence will not suffice." *Id.* (quoting Restatement (Second) Torts, § 908). Punitive damages are appropriate only where a defendant's actions transcend negligent conduct and rise to willfulness and wantonness. *Id.*

86. *Id.* at 530.

claim of recklessness is based on an error of judgment, a form of passive negligence, the plaintiff's burden is substantial."[87] "It must be shown that the precise harm which eventuated must have been reasonably apparent but consciously ignored."[88]

Plaintiffs argue punitive damages are warranted against Bell because the accident engine, manufactured in 1993, did not meet the FAA's 1989 safety standards. Rather, the accident helicopter model was certified in the 1970's and met the then-applicable minimum standards. In response, Bell argues that it obtained all the necessary authorizations and clearances to produce the accident helicopter in 1993 and that the accident helicopter model doubled the minimum load resistance requirements.[89]

Finding no Delaware case on point, the Court relies on the Northern District of Texas's useful analysis of the effect of a defendant's regulatory compliance on its potential punitive damages liability.[90] In

*Morris v. Cessna Aircraft Co.*, an action against an aircraft manufacturer by plaintiffs injured during a plane crash, the federal district court considered whether compliance with "all applicable regulatory standards for aircraft design and safety, as evidenced by the type certificate issued by the FAA,"[91] relieved Cessna, the defendant, of liability for punitive damages. The Court determined that "while evidence of regulatory compliance does not foreclose an award of punitive damages as a matter of law, such evidence may demonstrate the absence of a genuine dispute of material fact as to gross negligence and malice."[92] And the Texas Court of Appeals has held:

> When a seller relies in good faith on the current state of the art in safety concerns, and on conclusions by the governmental agencies charged with administering safety regulations in the area of its product that the product is not unreasonably dangerous, it cannot be said to have acted with an entire want of care

---

87. *Id.* at 531.

88. *Id.*

89. *See* Bell's Rep. Brf., Sept. 30, 2013, Trans. ID # 54307727, at 9–10 (describing the three-step process by which Bell obtained from the FAA a type certificate, a production certificate, and an airworthiness certificate for the Model 206L–4 helicopter).

90. *See Morris v. Cessna Aircraft Co.*, 833 F.Supp.2d 622, 640–41 (N.D.Tex.2011). The Texas standard for punitive damages liability is analogous to the Delaware standard. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.003(1) (2013) ("[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence."); Tex. Civ. Prac. & Rem.Code Ann. § 41.001(11) (" 'Gross negligence' means an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its

occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective *awareness* of the risk involved, but nevertheless proceeds with conscious *indifference* to the rights, safety, or welfare of others.") (emphasis added); *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 529–30 (Del.1987) (equating the "outrageous conduct" that warrants a punitive damages award to the "willful and wanton standard," which "refers to a distinct state of mind, one a conscious *awareness*, the other a conscious *indifference*.") (emphasis added). In comparing willfulness and wantonness with negligence, the Delaware Supreme Court in *Jardel* described the former as "an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences," and the latter as "lack[ing] any intent, actual or constructive." *Id.*

91. *Cessna*, 833 F.Supp.2d at 640.

92. *Id.* at 641.

showing conscious indifference to the safety of the product users, or to have acted with conscious indifference to an extreme degree of risk.[93]

Just as in Delaware, Texas courts recognize that the difference between ordinary negligence and punitive damage-worthy conduct is "the culpable mental state of the defendant." [94] In *Cessna*, the crash-victim plaintiffs presented evidence that Cessna knew its testing equipment was not operational on the day it ran the safety tests to secure its FAA certification.[95] Thus, even though Cessna used alternative testing, disclosed all test results to the FAA, and subsequently received its FAA certification, and even though there was no issue of material fact surrounding compliance, Plaintiffs had successfully presented "evidence of the culpable mental state required to survive summary judgment on the issue of gross negligence," by demonstrating that Cessna affixed superior testing equipment to its test aircraft, but took no steps to carry out testing with a fully operational device.

Plaintiffs here have presented no such evidence of Bell's culpable mental state, or the "the perception the actor had or should have had of the risk of harm which [its] conduct would create." [96] This Court cannot say that Plaintiffs' evidence demonstrates Bell acted recklessly in continuing to manufacture an aircraft certified by the FAA, the "governmental agenc[y] charged with administering safety regulations," in the aircraft industry.[97]

### F. Plaintiffs' Crashworthiness Claims

▇▇▇▇ Finally, Bell seeks summary judgment on Plaintiffs' crashworthiness claims. The "crashworthiness doctrine is an extension of the general principle that a manufacturer has a duty to design its products for normal use." [98] While a manufacturer "is under no duty to design an accident-proof or fool-proof vehicle, ... such manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision." [99] Crashworthiness defendants are only responsible for injury "over and above" injury the victim would have experienced in an alternatively-designed automobile, or in this case, helicopter.[100] Thus a crashworthiness plaintiff "must show that the defective product was the proximate cause of the enhanced injuries." [101] Although "[t]he issue of proximate cause is almost always a question for the jury ... it must be supported by some degree of evidence;" [102] Plaintiffs here must "offer some evidence of a causal link between the [alleged] defective design and the [alleged] enhanced injuries." [103]

93. *Miles v. Ford Motor Co.*, 922 S.W.2d 572, 589 (Tex.App.1996) (reversed in part on other grounds).

94. *Cessna*, 833 F.Supp.2d at 641 (quoting *Miles*, 922 S.W.2d at 589).

95. Plaintiffs alleged that during the "icing conditions" testing, the aircraft was not exposed to the required "liquid water content." *Id.* at 642.

96. *Jardel*, 523 A.2d 518, 530 (Del.1987).

97. *Cessna*, 833 F.Supp.2d at 641.

98. *Mazda Motor Corp. v. Lindahl*, 706 A.2d 526, 530–31 (Del.1998).

99. *Larsen v. General Motors Corp.*, 391 F.2d 495, 502 (8th Cir.1968).

100. *Mazda*, 706 A.2d at 531.

101. *Id.*

102. *Id.* at 533.

103. *Id.* at 531. *Compare Huddell v. Levin*, 537 F.2d 726, 737–38 (3d Cir.1976) (requiring a crashworthiness plaintiff to "offer proof of

Bell argues Plaintiffs fail to present evidence of what lesser injuries the Pilot would have sustained in an alternatively-designed helicopter.[104] Plaintiffs contend that their expert, William H. Muzzy, discussed the issue in his expert report[105] and May 30, 2013 deposition.[106] After reviewing both, the Court agrees that Plaintiffs cannot meet their burden "to establish that the injuries actually received in [this] accident with [the alleged] defective product are greater than the injuries that would have been received in an accident with a non-defective product."[107]

Mr. Muzzy's four-page, expert report states: "[a] lack of energy attenuation in the seat cushion and pan, either through rate-dependent cushion material, stroking seats and/or other energy management scheme, was the primary cause of the T–10 fracture."[108] Plaintiffs also point to Mr. Muzzy's deposition, in which he estimated the Pilot's injuries reduced his chance of surviving the crash to zero percent.[109] Though Mr. Muzzy's statements clearly establish his expert opinion that the Pilot could not have survived the crash, Mr.

Muzzy's statements lack the essential element to sustain Plaintiffs' crashworthiness claim; Mr. Muzzy does not "identify the specific injuries that 'would have resulted had the alternate, safer design been used.'"[110] Mr. Muzzy further falls short of providing "some method of establishing the extent of the enhanced injuries attributable to the defective design."[111]

In *Huddell*, plaintiff's experts testified that the decedent's automobile accident would have been "survivable" with an alternatively-designed headrest.[112] Without more, however, that Court barred plaintiff's crashworthiness claim. The experts in *Huddell* failed to define "survivable" or to establish "whether the hypothetical victim of the survivable crash would have sustained no injuries, temporary injuries, permanent but insignificant injuries,"[113] etc. Mr. Muzzy's testimony fails in the same manner. While he identifies the Pilot's fatal injuries, and estimates the Pilot's survivability at zero percent, he fails to identify how the Pilot's injuries would have differed had Bell used a "non-

---

an alternative, safer design, practicable under the circumstances,.... offer proof of what injuries, if any, would have resulted had the alternative, safer design been used.... [and] offer some method of establishing the extent of enhanced injuries attributable to the defective design."), *with Mitchell v. Volkswagenwerk, A.G.*, 669 F.2d 1199 (8th Cir.1982) (shifting the burden to the defendant to identify the enhanced injuries, only after plaintiff offers some evidence of enhanced injuries cause by defective design), *and Fox v. Ford Motor, Co.*, 575 F.2d 774 (10th Cir.1978) (same).

104. *See* Bell's Mot. for Summary Judgment, Sept. 6, 2013, at 11.

105. *See* Ex. A to Aff. of John P. O'Flanagan, Sept. 6, 2013.

106. *See* Ex. D to Aff. of John P. O'Flanagan, Sept. 6, 2013.

107. *Mazda*, 706 A.2d at 532.

108. Ex. A to Aff. of John P. O'Flanagan, Sept. 6, 2013, at 4.

109. Ex. D to Aff. of John P. O'Flanagan, Sept. 6, 2013, at 103–04.

110. *Mazda*, 706 A.2d at 532 (quoting *Huddell*, 537 F.2d at 737–38).

111. *Id.* (quoting *Huddell*, 537 F.2d at 737–38).

112. *Huddell*, 537 F.2d at 738 ("Dr. Geikas similarly testified that the accident would have been 'survivable' if the head restraint had been designed 'for distribution of load, attenuation of force.'").

113. *Id.* at 738.

defective" seat or restraint.[114] This is the crux of Plaintiffs' crashworthiness claims, and without such proof of enhanced injuries, a jury would be unable to determine whether Bell is liable under a crashworthiness theory. For those reasons, Bell's Motion for Summary Judgment is **GRANTED** on the issue of crashworthiness.

### VIII. HONEYWELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES

■■■ Honeywell argues that Plaintiffs cannot meet Delaware's high burden for punitive damages claims.[115] The Court agrees and **GRANTS** Honeywell's motion for partial summary judgment.

The Court has laid out the standard for punitive damages in Part VII.E, above. Plaintiffs' cited evidence in support of their claim for punitive damages against Honeywell is the collection of SDRs.[116] Those, they say, demonstrate the "many instances of prior blockage of PG airflow restrictors in RRC C30–250 engines."[117] The Court has excluded the SDRs for the reasons set forth above. Regardless, the SDRs and any accompanying witness reports would still be insufficient to overcome Honeywell's partial summary judgment motion. Even looking at the facts in the light most favorable to Plaintiffs, the Court cannot say that Plaintiffs have raised an issue of fact with regard to punitive damages against Honeywell.

To prove their punitive damages claim against Honeywell under a theory of recklessness, Plaintiffs must first demonstrate Honeywell manufactured and distributed a defective product.[118] Then Plaintiffs must prove Honeywell perceived that the manufacture and distribution of the defective product would cause the type of harm claimed here.[119] Arguably Plaintiffs fail in both respects. But most assuredly they have presented no evidence that would tend to reasonably suggest Honeywell perceived or should have perceived any danger the original manufacture or distribution of the PTG would cause after its first service-life had run and it had been completely overhauled by its then-owner. That is what is required to proceed on a punitive damages claim here, and without such evidence, Plaintiffs claim fails. Honeywell's motion on punitive damages is **GRANTED.**

114. *See Mazda,* 706 A.2d at 532 ("A plaintiff will never be able to separate the hypothetical injuries from the total actual injuries received in a crash. But this does not mean that a plaintiff will be unable to prove the extent to which such injuries would have occurred with a non-defective product or even which injuries actually suffered were enhanced by the defective design.").

115. The Court has already determined, in response to Defendants' motion for applicable law, that Massachusetts law will govern any compensatory damages award in this case. No party has filed a motion to determine the law applicable to punitive damages claims, however Defendant Honeywell cites to both Massachusetts and Delaware law in its brief-

ing to support its claim that Plaintiffs' punitive damages claim fails under either.

116. *See* Ex. 49 to Plaintiffs' Responses to Defts' Mots. in Limine, Sept. 24, 2013.

117. *See* Pltfs' Ans. Brf. in Response to Honeywell's Mot. for Summary Judgment on Punitive Damages, Sept. 23, 2013.

118. *Jardel,* 523 A.2d at 530 (The two elements required to prove recklessness are the "manufacture or distribution of a defective product," and "foreseeability, or the perception the actor had or should have had of the risk of harm which his conduct would create").

119. *Id.*

## IX. CONCLUSION

For the forgoing reasons, Third–Party Plaintiff Bristow/AL's Motion for Summary Judgment is **DENIED,** Third–Party Defendant RLC's Motion for Summary Judgment is **GRANTED,** RRC's Motion for Summary Judgment is **GRANTED,** RRC's Motion for Partial Summary Judgment on Warranty and Punitive Damages is **MOOT.** Bell's Motion for Summary Judgment is **GRANTED in PART,** and Honeywell's Motion for Partial Summary Judgment on Punitive Damages is **GRANTED.**

**IT IS SO ORDERED.**

